Seymour and another agt. The Canandaigua and N. F. R. R. Co., and others.

amount thereof be collected by a tax, as a part of the town charges of that town, in the next levy of taxes, and be paid over to the relator or his attorney. The relator may also have $10, costs of this motion.

# SUPREME COURT.

Isaac Seymour and another agt. The Canandaigua and Niagara Falls Railroad Company and others.

It is the province and duty of courts of *equity* to relieve against defects and imperfections at law in the making of contracts. Regarding all just and honest contracts as binding in conscience and equity, they seek to give them full effect and operation, according to the real intention of the contracting parties.

When, therefore, it is expressly agreed to give a lien upon lands, courts of equity have long held that such agreement was to be treated and considered as giving a *specific lien* upon the land.

But a lien must have a *specific* reference. The agreement must necessarily apply to some *designated property* either in *esse* or expectancy, and this clearly and unmistakably ; and it must appear, too, that it was the intention of the parties to create a lien. When the agreement or mortgage would be void for uncertainty in not describing or designating plainly any lands or property, no lien can attach; it must be regarded as a mere executory contract and enforceable only as such.

Assignments or mortgages of property not *in esse*, to be acquired in *futuro*, or of contingent interests or expectances, confer no title or interest in *presenti;* but as soon as the property is acquired or comes into existence, the lien or charge in or upon it, attaches. They come into being together and co-exist. Equity executes the contract, by holding what is agreed to be done, as done; that the right to the lien creates the lien.

Considering, therefore, the rule in equity to be, that a grant of particular lands to be acquired in *futuro* is valid, and takes effect as a specific lien upon the lands as soon as they are acquired, the defendant's mortgage in this case, which did not profess to mortgage their road as complete, or with a title to the lands required for its use as acquired, but covered lands yet to be acquired, and buildings yet to be erected, was considered a valid lien upon all the property therein described or intended to be mortgaged, from the time of the recording the mortgage.

. Seymour and another agt. The Canandaigua and N. F. R. R. Co., and others.

The *description* in the mortgage of the land acquired and to be acquired, must be deemed to refer to the charter of the company, (allowing them to take upon the route of the proposed road a strip of land six rods in width,) and the law defines the land which the mortgage is designed to cover, and the lien of the mortgage clearly attached to such unacquired land so soon as the title thereto passed to the corporation.

*Held*, that this mortgage covered and embraced the subsequent acquired lands upon another and distinct ground, independent of the rule in equity above referred to.

The statute (§ 28, *sub.* 10, *of the General Railroad Act*,) authorizes a railroad corporation, organized under such act, " from time to time, to borrow such sums of money as may be necessary for completing or finishing, or operating their railroad, and to issue and dispose of their bonds for an amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company for the purpose aforesaid."

The mortgage in this case, was made in pursuance and by virtue of this statute, and was clearly authorized by it; and was of the whole railroad, and of all the real property of the corporation, and its franchises, rights and interests acquired and to be acquired, as an entirety.

It was, therefore, immaterial whether the right of way for the railroad was all acquired or not, at the time the mortgage was put upon record, and equally immaterial whether the road had or had not, been then entirely located, or the location thereof, if previously made, afterwards changed.

*Held*, also, that the *branch road* from the main track at Tonawanda to Niagara river, which was not laid out, nor even projected, at the time of the original location, was covered by the mortgage as a legitimate incident of the main road, as necessary or convenient for its use and enjoyment, as much·so as side tracks, turnouts, wood-yards, shops and engine-houses, and it, therefore, passed with the grant of the railroad and its franchises as an appurtenance,—as a legitimate prospective incident to such road.

*Seventh District, General Term, Rochester, September,* 1857.

THIS was an action brought to foreclose a mortgage made by the Canandaigua and Niagara Falls Railroad Company, to secure an issue of sterling bonds, of the equivalent of one million of dollars. The mortgage embraced the railroad of the company, and all its lands and real estate then acquired or thereafter to be acquired. A portion of the lands occupied by the road, including those occupied by a branch road, had not been purchased by the company at the time the mortgage was made.

Certain of the judgment creditors of the company, insisted that the lien of the mortgage did not bind such of the after acquired lands, or at least, that their lien on these after acquired lands,

and particularly on this branch road, were superior to the lien of the plaintiff's mortgage. The facts of the case will be found in the opinion of the court.

CLARKSON N. POTTER, *for plaintiffs.*
SANFORD E. CHURCH, *for defendant Hinds.*
MOSES TAGGART, *for defendants Otis and Worthington.*

By the court—E. DARWIN SMITH, Justice. It does not appear at what precise time the bonds mentioned in the mortgage described in the complaint in this action, were actually issued to *bona fide* holders, or at what time the money borrowed thereon was in fact advanced. The mortgage was made to secure these bonds, which were to be issued to such persons as should be found thereafter willing to advance their money upon such security. Seymour and Coe, the mortgagees named in the mortgage, were mere trustees for these bondholders. They did not at the time of the making and execution of the mortgage, make any advance to the railroad company on the mortgage, and were obviously not expected to do so. The bonds were payable in London, and of different sums or amounts; some were for two, some for five hundred, and some for one thousand pounds sterling, and all were to be countersigned by an agent of the railroad company in London. It is apparent, therefore, upon the face of the transaction, that there was no actual consideration for this mortgage given or advanced in this country, and that it was made and designed purely as a security for money to be borrowed in England; the mortgage and the bonds bear date March 17th, 1852. But in view of the fact that they were thus obviously made to be used abroad, and in the absence of any proof when the money secured thereby was actually advanced, I think it must be considered that the mortgage was inoperative till it was put upon record in the several counties through which the railroad was designed to pass. It is not to be presumed that persons going to advance money, on these bonds, would be likely to do so until they had evidence that the mortgage was duly recorded, so as to secure to this mort-

gage priority of lien over any other creditor of the corporation.

The mortgage was recorded in Ontario county, May 3d, 1852, and in the other counties within a day or two thereafter, except in Genesee, where it was recorded on the 10th of June, following.

At the time when the mortgage was thus put upon record, it doubtless took effect as a valid mortgage, at law, in behalf of all persons who then had made advances, or should thereafter make advances upon these bonds or any of them. As a legal instrument of conveyance it was then notice to all the world, and was valid and operative to bind all the property and franchises then owned by the corporation embraced within its terms and descriptions. So far as relates to property then acquired, this is not disputed and is indisputable.

The chief question in controversy relates to the property of the railroad company not then owned or acquired by it. When the mortgage was first put on record, May 3d, 1852, it does not appear how far or to what extent the railroad company had acquired the right of way for the railroad. They obviously commenced the work of constructing the road at Canandaigua, its eastern terminus, and worked westward; for it appears it was completed and put in operation from Canandaigua to Batavia, by the first of January, 1853, and from that point to the Suspension Bridge, at Niagara, on the first of July following, and there is no proof that the right of way was not all acquired up to the east line of Genesee county, at the time of recording the mortgage. In Genesee, Erie and Niagara counties, confessedly, much of the right of way was acquired after the mortgage was recorded in those counties respectively. Upon all such lands clearly the plaintiff's mortgage was not and is not a valid lien *at law.* It is a fundamental maxim of the common law, that a man cannot *grant or convey* what he does not own. (*Perkins, Tit. Grant,* § 65; *Noys' Maxims,* 62; *Bacon's Maxims, Reg.* 14.)

In giving the mortgage, the railroad company did not profess to own or to mortgage the whole right of way for the railroad.

They granted " all and singular, the railways, rails, bridges, fences, privileges, rights and real estate, now owned by the said company, or which shall hereafter be owned by them, and all lands used and occupied, or which may hereafter be used and occupied for railways, depots or stations, with all buildings erected, or which may be hereafter erected thereon." Here was an additional notice that there were lands yet to be acquired, and buildings yet to be erected. The mortgage contains a covenant that the money loaned shall be used in constructing the railroad.

The railroad company, therefore, did not profess to mortgage the road as complete, or with a title to the lands required for its use as acquired. There is, therefore, no question of estoppel in the case at law as against the railroad company itself. But the plaintiffs claim that their mortgage is a valid lien in equity upon the subsequently acquired property. It is not denied by the learned counsel for the defendants, that such a lien sometimes exists, which courts of equity may sustain and enforce in many cases where there is no relief at law ; but it is insisted that this is not a case of equitable mortgage, and that the rights of the defendants as judgment creditors, are superior to any equities of the plaintiffs in respect to these subsequently acquired lands.

Courts of equity, though unembarrassed by the strict and technical rules of the common law, do not administer justice except in conformity with settled principles. It is the province and duty of such courts to relieve against defects and imperfections at law in the making of contracts. Regarding all just and honest contracts as binding in conscience and equity, they seek to give to them full effect and operation, according to the real intention of the contracting parties. Upon this principle they enforce the specific execution of contracts and give relief in numerous agreements relating to lands, and things in action, and contingent interests or expectances, upon the maxim, equity considers that done which being distinctly agreed to be done, ought to have been done. (*Grounds and Rudiments of Law and Equity*, p. 75.) Upon this principle, when it is expressly

agreed to give a lien upon lands, courts of equity have long held that such agreement was to be treated and considered as giving a specific lien upon the land. The learned counsel for the defendants conceded this to be so, and contended •that the rule was rightly stated in Fonblanque, *book* 1, *chap.* 5, *and sec.* 8, and in the cases reported in 1 *Peere Williams, pages* 282 *and* 429. Fonblanque states the rule thus : " A covenant to settle or convey particular lands will not, at law, create a lien upon the lands, but in equity such a covenant, if for a valuable consideration, will be deemed a specific lien on lands and decreed against all persons claiming under the covenantor except purchasers for a valuable consideration, and without notice of such covenant," and refers to *Coventry* agt. *Coventry,* reported at the end of *Francis' Maxims:* Fonblanque also says, (*book* 1, *chap.* 4. *sec.* 9.) " So although a grant of a possibility is not good at law, yet a possibility, or a trust in equity, may be assigned. So a covenant to settle lands, of which he has only a possibility of descent, shall be carried into execution in equity, for the court does not bind the interest, but instead of damages, enforces the performance in specie." Chancellor WALWORTH, in the *Matter of Howe,* (1 *Paige,* 129,) and in *White* agt. *Ca.- penter,* (2 *id.* 266,) affirms this principle, and in *Howe's case* he'refers to most of the English cases holding this doctrine with approval, and cites quite a number of American cases from other states to the same effect.

The counsel for the defendant Hinds, however, cited and commended to my attention on this point, the case of *Otis* agt. *Sill,* (8 *Barbour,* 102.) This was a case at law. The only question raised and decided there was, whether at law a chattel mortgage bound property not in esse at the time of its execution ? The mortgagor professed to sell and assign to the plaintiff not only all the scythes, iron, steel and coal, then owned and possessed by him, but also all the scythes, iron, steel and coal which may be purchased in lieu of the aforesaid property. The court in that case, held that a chattel mortgage could not operate at law on property not in actual existence at the time of its execution. The decision was clearly right, (1 *Man.,*

*Gran. and Scott,* 379.) The learned judge who gave the opinion of the court, it is true, in the course of his opinion, discussed at some length, the question whether the mortgage was valid in equity, but concluded that the pleadings did not raise that question so that relief could be given in equity, and the case was decided as purely one of law. Now, although the learned judge doubted whether the rule in equity in respect to mortgages or contracts for a lien upon subsequently acquired property, applied to that case, and considered that Judge STORY had carried the doctrine too far in the case of *Mitchell* agt. *Winslow,* (2 *Story,* 630,) yet he assents to the rule as stated above in Fonblanque, and by the chancellor. He says, page 129, "The agreement to execute a mortgage on particular lands described in the agreement, is doubtless, in equity, a specific lien on the land, and will be preferred to subsequent judgment creditors."

The rule as here stated, that the mortgage or agreement must refer to particular lands, is doubtless the true one. It was so laid down in the leading case of *Fremont* agt. *Dedire,* (6 *Peere Williams,* 430.) In this case, Dedire had covenanted to settle his lands in Romsey Marsh, and also other lands that should be of the value of £60, upon his wife, for her life. The Lord Chancellor held, that with regard to the lands in Romsey Marsh, the marriage articles created a specific lien upon them, but the covenant for settling lands of the value of £60 per annum, did not specifically bind any lands. The same obvious distinction runs through all the cases. When the agreement would be void for uncertainty, in not describing or designating plainly, any lands or property, no lien can attach. A lien must have a specific reference. It must necessarily apply to some designated property, either in esse or expectancy, and this clearly and unmistakeably. Unless the agreement, or mortgage, plainly describes or designates particular lands, it must be regarded as a mere executory contract and enforceable only as such. (*Miners and Mechanics' Insurance Co.,* 4 *Met.* 316.) And it must clearly appear too, that it was the intention of the parties, in any covenant or agreement, to give a lien upon the property. (*Rogers* agt. *Hosack's Executors,* 18 *Wend.* 319.) In this last case

referred to by Judge PAIGE, in *Otis* agt. *Sill*, the covenant was to pay the balance of a debt from a certain fund. This was held to create no lien upon the fund, and to be a mere executory agreement. Judge COWEN (*p.* 334) says: "Here is no assignment, no mortgage or pledge, no order or any other specific appropriation of the French funds, but a mere covenant to pay them over on their being obtained by the covenantee." Senator DICKINSON also speaking of another fund, says: " The English claim is disposed of by word of assignment or transfer. Can it be possible, that with an intention to create a specific lien or equitable mortgage upon the French fund, the parties should have left this large fund to the caprice of implications?" In both these opinions the rule is clearly recognized, that an agreement for a lien is a lien in equity, when it is clear, that it was the intention to give, or create such lien. In the case of *Otis* agt. *Sill*, however, the learned judge says, of these cases of assignments, or mortgages of property, to be acquired in *futuro*. " If such an assignment of property, to be acquired, is valid in equity, it is only valid as a contract to assign, when the property shall be acquired, not as an assignment of a present interest in the property, and if it is enforced in equity, it can only be enforced as a right under the contract, and not as a trust attached to the property." If the learned judge means by this, that a sale, assignment or mortgage of property not in esse, or of contingent interests or expectances, confers no title or interest in the thing in *presenti*, that is self-evident. But if it is meant that the sale or assignment of such property, to be acquired in *futuro* or of contingent interests, or expectances, rests in contract merely till some new assurance, and does not attach as a lien or charge as soon as the property is acquired or has a substantial existence, I cannot agree with him. As soon as the property is acquired or comes into existence, the lien in or upon it attaches. They come into being together and co-exist. Equity executes the contract by holding that what is agreed to be done as done; that the right to the lien creates the lien. (*Wright* agt. *Wright, Vesey,* 409 *and* 410.)

Judge STORY, in *Mitchell* agt. *Winslow,* (2 *Story,* 644,) states

the rule with great clearness, as follows: " It seems to me a clear result of all the authorities, that whenever the parties, by their contract, intended to create a positive lien or charge either upon real or personal property, whether then owned by the assignor or contractor or not, or if personal property, whether it is then in being or not, it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto against the latter, and all persons asserting a claim thereto under him, either voluntarily or with notice of its bankruptcy." The same doctrine is also asserted in substance by Vice-Chancellor WIGRAM, in *Langton* agt. *Horton*, (1 *Hare Rep.* 549,) in an opinion of great clearness and ability; and in 1 *Jac. & W.* 526; 4 *Simon*, 624. An assignment of that which is expected to be the fruit of an undertaking already commenced, of possibilities coupled with an interest, or of a thing which, in the ordinary course of events, will exist at a future time, is valid in equity, (1 *Myl. & K.*, 488; 6 *Sim.* 414 *and* 224; 8 *Pri.* 269,) but not a mere naked possibility, and not an interest incapable of being made the subject of a contract. (4 *Kent*, 144.) These cases, and this view of the rule in equity, in respect to the assignments of future interests or possibilities, is clearly sustained and affirmed in the opinion of Judge WELLES, in *Field* agt. *The Mayor of New-York*, (2 *Selden*, 186.)

Considering, therefore, the rule in equity to be, that a grant of particular lands to be acquired in *futuro* is valid, and takes effect as a specific lien upon the lands as soon as they are acquired, it remains to apply the principle to the facts of this case. Upon the evidence, I think, that I am to assume that the line of this railway, from Canandaigua to Suspension Bridge, was located before the mortgage was put on record in any county. It is true, that it was afterwards altered in Erie and Niagara counties, but that, I think does not affect the question I am now considering. The railroad company by the 28th section of the general railroad act, which must be deemed a part of its charter, and to be part of the contract with the plaintiffs, (whose rights may be considered as acquired under it and governed by it,)

was authorized to enter upon the lands and waters of any person for the purpose of making examination and survey of its proposed road. And, by section 22, the corporation was required to file a map or profile of the route of its intended road, duly certified in every county named in its articles of association, before proceeding to construct any part of its road in such county. In addition to this map, the corporation was, by section 14, required to file a certificate of location in conformity with such map, signed by a majority of the directors, in and by which map and certificate, the line of the said railroad is to be designated and located. Upon the line thus fixed and located, the railroad company was entitled by subdivision 4, of said section 28, "To lay out its road not exceeding six rods in width, and for the purpose of cuttings and embankments, to take as much more land as may be necessary for the proper construction and security of the road." Upon the route of the proposed railroad of the company from Canandaigua to Niagara Falls, immediately upon the location of such road, in manner aforesaid, a strip of land six rods in width, was laid out and designated for the road of this company, of which it was entitled to take so much as it required for the use of the railroad, on making due compensation therefor. The company had in effect, by its charter, a patent from the state to enter upon and appropriate such strip of land to its own use so soon as it had made due compensation therefor. Its right was absolute, subject only to that single reservation or condition, and the strip of land is clearly defined and designated by law. This strip of land is the land referred to in the plaintiff's mortgage, with sufficient particularity and definiteness to answer the rule in equity. This strip of land is *particular land*, in the language and sense of the rule in equity, as laid down in the case in Peere Williams and by Fonblanque. The description in the mortgage of the land acquired, and to be acquired, must be deemed to refer to the charter, and the law defines the land which the mortgage is designed to cover, and the lien of the mortgage clearly attaches to such unacquired land so soon as the title thereto passed to the corporation. But if the rule be, as some of the cases hold, that

a disposition by deed or mortgage or assignment of after acquired property, while it is inoperative as a conveyance of the title, may be considered as a declaration precedent, which will derive its effects from some new act of the party after the property is acquired, (*Bacon's Maxims Reg.* 14; *Sumner* agt. *Thurston*, 1 *Man.*, *Gran. and Scott*, 379,) then, certainly, the two subsequent mortgages executed by the railroad company, one September 16th, 1853, and the other December, 1853, both after the road had been constructed and was in operation, and both containing an express reference to plaintiffs' mortgage, and both expressly covering all this property, and subject in terms, to the prior lien of such mortgage, must be deemed a sufficient act of new or further assurance or ratification to satisfy the rule in question.

But, I think, this mortgage covers and embraces the subsequently acquired lands upon another and distinct ground, independent of the rule in equity above referred to. The statute (*subdivision* 10 *of section* 28, *of the General Railroad Act,*) authorizes a railroad corporation, organized under such act, "from time to time to borrow such sums of money as may be necessary for completing or finishing, or operating their railroad, and *to issue and dispose of their bonds for an amount so borrowed,* and to mortgage their corporate property and franchises, to secure the payment of any debt contracted by the company for the purpose aforesaid." The mortgage in this case, was made in pursuance and by virtue of this statute, and is clearly authorized by it. The charter of the Niagara Falls Railroad Company was itself a franchise, and it included a right to enter upon and take lands for this railroad, and to construct and operate the road. The right to take and enter upon the particular lands required for the purpose of the railroad, was included and embraced in the mortgage, and is clearly conveyed and bound by it. The legislature authorized the corporation to mortgage their "franchises, together with their corporate property." All the rights and interests of the corporation were included in these words. I think the legislature intended to give authority by this statute to railroad corporations to mortgage all and singu-

lar, the property of the corporation, with all its franchises, rights
and interests acquired, and to be acquired, as an entirety. And
that the mortgage in this case, is of the whole railroad, and of
all the real property of the corporation and its entire franchises,
in as full and complete a manner as the corporation could pos-
sess, exercise and enjoy, such rights and franchises.   In this
aspect of the question, it is, therefore, entirely immaterial
whether the right of way for the railroad was all acquired or
not, at the time the mortgage was put on record, and it is
equally immaterial whether the road had or had not been at
that time entirely located, or the location thereof if previously
made, was afterwards changed.   The right to change its loca-
tion was one of the chartered privileges of the corporation, and
was embraced within the grant of its franchises.   So, also, was
the right to take such lands as might be requisite to complete
the road upon its original or upon any altered line.   This point
was so held by my brother JOANSON, in the case of *John A.
Stevens and others* agt. *The Buffalo, Corning and New-York R.
R. Company*, tried before him at special term at Corning, in
November, 1856, as appears from notes of his decision fur-
nished me by counsel, no opinion having been written by the
judge.   The question has been decided in the same way by the
supreme judicial court of New Hampshire, in the case of *Pierce
and others* agt. *Emery and others*.   In this case, the Portsmouth
and Concord Railroad Company, under an act of the legislature,
had mortgaged its road to secure bonds to the amount of
$350,000.   The mortgage conveyed all the real and personal
estate of the corporation, with all rights, franchises, powers and
privileges.   It was held, that the mortgage covered the whole
railroad, with all its corporate rights and franchises, as an en-
tire thing including subsequently acquired property.   In the
case of *Willinck* agt. *The Morris Canal and Banking Company*,
(3 *Green Chancery Rep.* 402,) in the court of chancery of New
Jersey, the chancellor asserts the same doctrine.   In this case,
under an act of the legislature of New-Jersey, the Morris Canal
Company had mortgaged its canal, with all and singular, its
property and franchises, then in the course of completion from

the Delaware to the Hudson river.  The question was, whether the mortgage covered the canal between Newark and Jersey City?  The route had been surveyed, but the canal had not been excavated or any of the lands purchased till after the mortgage was given.  The chancellor held, that the mortgage embraced the entire canal and everything connected with it, including feeders, wharves, docks and piers, and all other appendages.

The only remaining question to be now considered, relates to the branch track from the main track at Tonawanda to the Niagara river, or to the docks on the banks of the river.  This branch was not laid out at the time of the original location of the road, and obviously, was not then projected or contemplated, at least at the place where it is now located.  But I think it is covered by the mortgage as an incident to the principal subject of the grant, upon the maxim " that whoever grants a thing, is supposed tacitly to grant that without which the grant itself would be of no effect."  (*Broom's Legal Maxims,* 198 ; 11 *Rep.* 52.)  When a thing is granted, all the means to attain it, and all the fruits and effects of it are granted also. (*Shep. Touch.* 89.)  It is a rule of law that the incident passes by the grant of the principal, (*Broom,* 205,) whatever is essential to the use and enjoyment of the principal thing.  (4 *Kent,* 467.)

Now the railroad company, most obviously, contemplated meeting the business of Lake Erie at Tonawanda, and expected to derive a large revenue from that source.  The report of the president of the company, made in 1851, speaks of Tonawanda as being the best harbor on Lake Erie, and goes into a calculation in respect to the amount of business that will come to the railroad at that point.  In another place in the report, speaking of Tonawanda, it states, that " at this point the road will receive the traffic of the lake," and adds, that the imports of that harbor had amounted to nearly $100,000 in the year 1851, and describes the thriving village of Tonawanda in language well adapted, and doubtless designed for a foreign market.  But independently of this report and of all evidence of a purpose or

expectation on the part of the company to connect its road by a branch with Niagara river at this point, the company had the undoubted right to do so, and what was so obviously for their interests the law will not presume they would be likely to overlook.    Tonawanda was an important point on the line of their railroad, doubtless the most important point between Canandaigua and the Suspension Bridge at Niagara.    Perhaps more important even than its terminus at the Supension Bridge.    At such a point it is not to be intended or supposed that the railroad company would not construct a branch to meet the business designed for the railroad on the bank of the river, and make such erections and 'connections by branch and side tracks as should be adapted to facilitate and promote their convenience and interest in receiving freight from and delivering it to lake vessels in the harbor.    The branch road is, therefore, in my opinion, a legitimate incident of the main road, as necessary or convenient for its use and enjoyment as side tracks, turn-outs, wood-yards, shops and engine-houses, and it therefore passes with the grant of the railroad and its franchises, as an appurtenance, as a legitimate prospective incident to such road.    But the railroad company being bound to make further assurance, and this branch having been constructed before the second and third mortgages were given, and before any of the judgments of the defendants were recovered, I think the plaintiffs can hold it under their mortgage by force of the new declaration or assurance contained in these mortgages, as they may upon the same principle the lands purchased for depots and station-houses and the like uses.    The defendant Hinds sets up no equity that attaches to the right of way.    The railroad company paid for the land on which the branch track is located, in its stock.    The consideration for the judgment of the defendant Hinds, is for labor, services and materials found in constructing such branch. He has no equity which can take priority over the plaintiff's mortgage.    As the plaintiffs have an equitable lien upon the railroad, its tracks and appurtenances, upon well settled principles, such lien must prevail over the lien of the judgment creditors.    Courts of equity control judgments and enforce and

protect the prior equitable title in preference to the judgment. (23 *Eng. Ch. Rep.* 561 ; 1 *Paige*, 284 ; 3 *Comstock*, 187 ; 3 *Kernan*, 188.)

But the equitable rights of the plaintiffs only extend to the particular lands designated by statute, and which the company was authorized to take, and did take, for the use of its road. The railroad company, in addition to the right to lay out its road not exceeding the width of six rods, and to take the land therefor, and as much more as should be necessary for cuttings and embankments, was also entitled by subdivision 3, of section 28, " To purchase, hold and use all such real estate and other property, as may be necessary for the construction and maintenance of its railroad and the stations and other accommodations necessary to accomplish the objects of its incorporation."

Under this provision, the company was authorized to purchase and hold such lands as were necessary for depots, stations, warehouses, wood-yards, shops and other legitimate railroad purposes. All such lands, with the erections thereon, would pass to the complainants, under their mortgage, as part of the railroad, or as essential to its use and enjoyment. But lands acquired by the railroad company and thus not used or employed for railroad purposes, would not come within the description of the mortgage.

The particular lands which were to be acquired after the mortgage was put on record in the several counties through which the railroad passed, within the rule above stated, must necessarily be the lands designated by the statute for the railroad, and such as the company was authorized to acquire and take for its track and legitimate use, as above stated. These are embraced within the premises of the mortgage, and nothing beyond. It is in proof that some of the lands purchased in Batavia, have never been used for railroad purposes. That in some instances, whole lots were purchased to secure a right of way across them. If the railroad company for this purpose had purchased a lot of ten or one hundred acres, it cannot be that any more of such lots would be embraced in this mortgage to the plaintiffs than was actually taken and required for the road. In

respect to all such lands outside of the legal limits of their railroad track and branches, and excepting land used for shops, depots, stations, turn-outs for wood or water, or other legitimate purposes, the lien of the defendants' judgments must prevail. The plaintiffs have no legal or equitable lien upon such lands, and they are liable, therefore, to the legal claims of the other creditors of the corporation. It is not in proof with sufficient distinctness what lands were acquired by the company which, within the principle above stated, will not be covered by the plaintiffs' mortgage. It will, therefore, be necessary, that in such decree as shall be made, to provide by reference to ascertain what lands were owned by the railroad company which are subject to the lien of the judgments of the defendants, Hinds, Otis and Worthington, and to determine the relative rights of the defendants in respect to such lands as among themselves, or to the proceeds of lands, if the same or any part thereof shall have been sold.

The plaintiffs are entitled to a decree for a foreclosure of their mortgage for the amount due them, with costs, upon the whole railroad, its track, property and appurtenances, upon the principles above stated.